1                                      JUDGE ROBERT BRYAN

2

3

4

5

6                     UNITED STATES DISTRICT COURT
            WESTERN DISTRICT OF WASHINGTON AT TACOMA

7

RALPH DEITCH and JANET IMUS, husband    )
8 and wife,                                   )     No. C06-5394RJB
                                     )
9                  Plaintiffs,      )
                                     )     PLAINTIFFS' TRIAL BRIEF
10                 v.             )
                                     )
11 THE CITY OF OLYMPIA, a Municipal      )
  Corporation; CLIFF MAYNARD, in his individual )
12 capacity; JACOB BROWN, in his individual    )
  capacity; DAN SMITH, in his individual capacity; )
13 JOHN DOE #1, in his individual capacity; and   )
  MICHELLE ASHLEY-COLE, in her individual   )
14 capacity,                                )
                                   )
15                 Defendants     )
16 _____)

17       On August 16, 2005 Olympia Police Department (OPD) Officer Cliff Maynard accepted an

18 invitation from plaintiffs' neighbor, Michelle Ashley-Cole, to enter and retrieve a former tenant's

19 abandoned property from plaintiffs' residence without consent from the homeowner, without a

20 court order, and without a warrant.  During their "retrieval mission", Maynard used physical force

21 to restrain Janet "Jan" Imus, in her own home.  He threatened her with arrest if she did not

22 cooperate.  Officer Jacob Brown provided backup, and did nothing to intervene or protect the

23 protesting homeowner. When Jan called 911 to complain about a police burglary in progress, Sgt.

24

25

LAW OFFICE OF
**HUGH J. McGAVICK, PS**
2937 INGALLS WAY
EUGENE, OR 97405
(541) 505-9145
FAX (541) 505-9143

1  Dan Smith responded, but did nothing to intervene or protect her property.

2      Ashley-Cole acted "under color" of state law, as did the other individual defendants, when

3  they acted in concert to deprive plaintiffs of their rights.  The individual officers were negligently

4  trained and supervised.  The City of Olympia has a custom, policy and practice of making unlawful

5  entry into private homes, participating in the unlawful seizure of property and using excessive

6  force.  The City ratified the conduct of its officers by failing to investigate their conduct, by failing

7  to investigate citizen complaints, and by failing to discipline the officers or take corrective action.

8  **I.    FACTUAL ALLEGATIONS**

9      **A.    Conduct of All Four Individual Defendants**.

10      In 2005, plaintiffs Ralph Deitch and Janet Imus, husband and wife, resided in Olympia,

11  Washington.  They were both Registered Nurses.  Michelle Ashley-Cole, a private citizen, lived a

12  few doors away from plaintiffs.

13      Ralph's adult sister Andrea Deitch ("Andrea") is a schizophrenic with a schizoid

14  personality disorder, who was a ward of the State of California from 1996 through 2002.   In 2002,

15  Plaintiffs were concerned about Andrea Deitch's welfare, so they brought her to live with them in

16  their Olympia home as a rent-paying ($350 per month) tenant.  They became her payees for her

17  $545 per month SSI, which were paid on the first of the month for expenses incurred the previous

18  month.

19      On May 12, 2005, Sherry Crisp, Andrea's mental health case manager at Behavioral

20  Health Resources (BHR), reported to Adult Protective Services (APS) that Andrea wanted to leave

21  plaintiffs' house.

22      On May 30, 2005, Andrea decompensated into a schizophrenic crisis, and needed medical

LAW OFFICE OF
**HUGH J. McGAVICK, PS**
2937 INGALLS WAY
EUGENE, OR 97405
(541) 505-9145
FAX (541) 505-9143

1  intervention.  Maynard responded to plaintiffs' residence after a 911 call from Ashley-Cole.  His

2  May 31 report stated: "...based on information I had at the time I did not believe a crime had

3  occurred, and the issue was likely the behavior of Andrea".  Later on the same day, Maynard

4  returned in response to another call from Ashley-Cole, "investigated", and arranged with a local

5  women's shelter, "Safe Place", for Andrea's immediate "relocation".  He reported that Andrea was

6  "adamant she did not want to go back to the house", and she also said she would "rather it be in a

7  group home or someplace else".

8        The same day, Ashley-Cole volunteered to help Maynard.  She took Andrea to a motel that

9  afternoon (paid for with Safe Place vouchers) after she "gathered some groceries from my own

10 home" for Andrea.  She visited Andrea at her new residence after that, and gathered household

11 items to help her get settled in her new residence.  Ashley-Cole discussed with BHR Case

12 Manager Sherry Crisp "what steps they were taking to get her permanent housing".  Crisp and her

13 husband went to Ashley-Cole's house with a trailer to collect items Ashley-Cole acquired for

14 Andrea's "new residence away from Safe Place".

15

16       Ashley Cole knew that after May 30, Andrea was not living at the Deitch residence.  On

17 May 30,  Andrea had moved out of plaintiffs' home never to live there again.

18       On May 31, 2005, Jan took Andrea's Medicaid Card for the month of June and Andrea's

19 weekly medication containers to BHR, and requested the return of Andrea house and truck keys.

20 *See* Imus Dec., at para 17.  On June 1, Ralph Deitch picked up the keys from BHR.  As further

21 evidence of the permanency of Andrea's departure , on June 13, 2005, SSI sent a notice to

22 plaintiffs to inform them of a change in payee and address for Andrea for "future months", but

23 Andrea's copy of that letter did not get mailed to the Deitch-Imus residence.  The last time Andrea

24

25

LAW OFFICE OF
**HUGH J. McGAVICK, PS**
2937 INGALLS WAY
EUGENE, OR 97405
(541) 505-9145
FAX (541) 505-9143

1 received her copy of her monthly Medicaid card from Washington Department of Health was in

2 May 2005.

3    Unknown to plaintiffs, on May 12, 2005, Andrea made false allegations of abuse by

4 plaintiffs to Crisp, which Crisp reported to Cindy Howard at APS, who in turn notified OPD and

5 the State DOH, Nursing Care Quality Assurance Commission ("Nursing Commission"), which

6 resulted in the issuance of a statement of charges against both plaintiffs by APS and the Nursing

7 commission.  APS charges against plaintiffs were dismissed on July 1, 2005.

8    Sometime in early August, Andrea asked Ashley-Cole to "accompany" her to retrieve her

9 belongings from plaintiffs' house.  Case Manager Crisp told Andrea "to have a police officer

10 accompany her" when she retrieved Andrea's belongings.  Before he left her house on May 30,

11 Maynard volunteered to Ashley-Cole that "... when Andrea was ready to retrieve her belongings to

12 contact the police."  On August 15, Ashley-Cole accepted his offer, and called Maynard to enlist

13 his help to retrieve Andrea's possessions from plaintiffs' home.

14

15    About 2 p.m. on August 16, Ashley-Cole called OPD Dispatch in an attempt to contact

16 Maynard, and advised he would know why she was calling.  Maynard returned Ashley-Cole's call,

17 and they put a plan in action.  He did not talk to plaintiffs or Andrea to assess the situation and

18 determine the appropriate role of the police before he agreed to oblige Ashley-Cole's invitation.

19    On August 16, Ashley-Cole drove to Andrea's "residence" (the place she and Crisp had

20 helped furnish) and picked up Andrea.  About 3:14 p.m., Ashley-Cole and Maynard arrived at

21 plaintiffs' home.   They made an unannounced, uninvited, and unauthorized entry.  They walked in

22 through the unlocked door to the back porch, and up the stairs to the open kitchen door:  Maynard

23 advised Ashley-Cole there was no need to knock.  They were both well aware the residence was

24

25

LAW OFFICE OF
**HUGH J. McGAVICK, PS**
2937 INGALLS WAY
EUGENE, OR 97405
(541) 505-9145
FAX (541) 505-9143

1  occupied, as Jan's TV was on loud (because she is hard of hearing), with windows and the interior

2  kitchen door open, and her truck in the driveway.  Brown arrived later, and entered the home prior

3  to Jan's awareness her house was occupied.

4      About 4:00 p.m., Jan was at home working on her computer, when she saw Maynard out

5  her home office window.  She asked if she could help him.  He responded: "No, that's all right.

6  We are getting what we need."  Confused by his answer, she went into her kitchen, where Maynard

7  had entered.  She saw Brown sitting on a bar stool at the kitchen eating counter.   Neither officer

8  acknowledged her inquiries about why they had not knocked, or if they would mind stepping out

9  until she could change clothes.

10      Jan next saw Ashley-Cole coming up the stairs from the basement, carrying an armload of

11  clothing belonging to Jan and her daughter, Kristina Kauffman.  Jan's questions about who she was

12  and what was she doing in Jan's house were answered by Maynard: "It's none of your business".

13      Jan then advanced towards Ashley-Cole, asked her what she was doing in her home, and

14  told her to stop as the clothes she was removing belonged to Jan.  As she attempted to confront her

15  neighbor, Maynard stepped between the two women, and told Jan not to interfere with Ashley-

16  Cole.  Jan directed Maynard and Brown to leave, and told them they had no right to come in her

17  house without even knocking.  She repeatedly asked to see any court papers which gave them the

18  right to enter her house, but they produced no such papers.  They did not have a warrant, nor did

19  they have a court order, nor did they have the owner/occupant's permission to enter her house.

20      Jan asked Maynard for the woman's last name, and he again responded that it was none of

21  her business.  Jan asked that she be able to inventory the items being taken: her repeated requests

22  were denied.  No inventory of items taken has ever been provided.

23

24

25
Law Office of
**HUGH J. McGAVICK, PS**
2937 INGALLS WAY
EUGENE, OR 97405
(541) 505-9145
FAX (541) 505-9143

1    About 4:05, Jan asked Maynard to at least be able to count the many full white garbage

2  bags that were still being carried out of her basement.  When she tried to go out to the driveway to

3  count the bags, Maynard grabbed her both wrists and restrained her from leaving the kitchen.  He

4  forcefully backed her into the refrigerator, and squeezed her wrist so tightly that she began to cry

5  from pain.  She kept repeating "Let go of my arm."  Maynard threatened to put her in cuffs and

6  take her to jail.

7    Shocked and in pain, Jan was still crying as she went upstairs and changed clothes.  About

8  4:13, she came downstairs with a picture showing Jan and her daughter wearing the hand-made

9  Russian outfits she had seen Ashley-Cole take.  She showed the picture to Brown, who made no

10 response, other than to say: "I'm just standing by".  Maynard refused to look at the picture.   He

11 also refused to look at the Nursing Commission letter she presented to him.  Jan was frantic.  She

12 feared essential exculpatory evidence for the Nursing Commission case was being stolen, and she

13 couldn't stop the continuing theft or even get an inventory.

14

15    About 4:15, Jan advised the officers that Andrea had not lived in her home since May 30,

16 and had therefore abandoned her belongings under the Landlord-Tenant Act: Maynard responded

17 by telling her he did not care.  Jan retrieved from her office the State Attorney General's

18 "Landlord-Tenant Act" publication she was familiar with because they owned a residential rental.

19 She opened it to page 26, "Abandonment", and showed it to Maynard , but he turned away.   She

20 then put it on the kitchen counter, opened to page 26, but Brown made no attempt to read it.  *Id*., at

21 para 47, and Ex. J-2 thereto.

22    Jan asked the police to stop taking her things so she could call her attorney.  Maynard

23 refused, and told her to go ahead and call her attorney.  Jan got a busy signal about 4:17, so she

24

25

LAW OFFICE OF
**HUGH J. McGAVICK, PS**
2937 INGALLS WAY
EUGENE, OR 97405
(541) 505-9145
FAX (541) 505-9143

called Ralph at work.  Ashley-Cole continued to carry items out.

At 4:19 p.m., Jan called 911 to report a robbery in progress in her house, being committed by the police, who had no warrant or court order.  OPD Sgt. Dan Smith arrived at the scene about 4:25.  He did nothing to stop Ashley-Cole.  Smith would not talk to Jan, because she was "too upset."  When she asked him for an inventory, he told her to call later, when she "calmed down".

All three officers and Ashley-Cole vacated the residence about 4:44.

On the evening of August 16, Ralph called Sgt. Smith and complained.

**B.    Actions and Failures to Act by The City Of Olympia and its Officers**

All three officers who arrived at plaintiffs' home on August 16 were on active duty, dressed in police uniforms, and drove OPD vehicles.  None of them filed an incident report, nor any other paperwork, about their activities at plaintiffs' home before plaintiffs filed individual Notices of Claim in May 2006.

The complained of conduct was not authorized by any OPD policy or procedure, and violated some policies and procedures.  OPD General Order (GO) 74.1.3(I) (revised 11/1/03) provided that the Department engages in "Authorized civil process" in only a limited number of circumstances, including: "service of protection, no-contact or anti-harassment orders issued by any court of jurisdiction...".  What happened August 16, 2005, was not OPD "Authorized civil process", as no court was involved.

OPD GO 74.1.4(I), "Other civil process", directed:

> "the Department to provide assistance during the serving of ***civil orders*** when it is demonstrated that disorder is likely to occur if an officer is not present to ***keep the peace***. The Department only facilitates the peaceful execution of the civil order in such circumstances.  Employees of the Department are not authorized to assume custody of property that is subject of a civil order."  (Emphasis added.)

LAW OFFICE OF
**HUGH J. McGAVICK, PS**
2937 INGALLS WAY
EUGENE, OR 97405
(541) 505-9145
FAX (541) 505-9143

1    What happened here was not "Other civil process" for several reasons.  First, there was no

2  "civil order", so this section was not operative.   Second, OPD had no other policy or procedure

3  regarding "keep the peace".   (The City's answer to interrogatory #10 stated: "There were no

4  specific policies, procedures or official guidelines (on August 16, 2005) relating to keep the peace

5  efforts that did not relate to civil process.  Civil process was covered by the 11/1/03 version of

6  General Order 74.1, and again, it has no application to this case because there was no civil

7  process".)  Third, neither Maynard or Brown were trained about how to "keep the peace" or

8  comply with GO 74.1.4 before or after August 16, 2005.  *See* Maynard Dep. at 18:10-13 ("I have a

9  vague recollection" of some relevant training.); and Chief Michel Dep., and Ex. 34 thereto (City

10  answer to interrogatory 2-A-e: "This is not the type of Order that would have received specific

11  'training'.").  When asked if he'd engaged in other similar conduct, Maynard answered "lots of

12  times".   Fourth, Maynard went well beyond any neutral "keep the peace" function: he took

13  Ashley-Cole's "side", and acted as her protector.

14

15    OPD GO 74.1.4(II)(A) provided that "OPD officers do not become involved in civil

16  process related to... (c)ivil actions related to evictions and noncriminal Landlord-Tenant disputes".

17  This was not an "Authorized civil process" under 74.1.3(I).  It was a "noncriminal Landlord-

18  Tenant dispute", involving landlord plaintiffs and their former tenant Andrea Deitch, yet Maynard

19  and Ashley-Cole, backed up by Brown, went into plaintiffs' residence to retrieve the prior tenant's

20  possessions.   When they entered the residence, based on false reports from Andrea, they operated

21  contrary to their training and sound police practices.

22    OPD GOs 74.1.3 and 74.1.4 have not been modified in any significant or relevant way

23  since the incident.

24

25

LAW OFFICE OF
**HUGH J. McGAVICK, PS**
2937 INGALLS WAY
EUGENE, OR 97405
(541) 505-9145
FAX (541) 505-9143

Ps' TRIAL BRIEF - 8

1    OPD policies in effect at the time required a written report to document the use of force,

2 but Officer Maynard did not file a written report.

3    Brown failed to intervene to assist Jan from Maynard's excessive use of force, or to disturb

4 the status quo, even though OPD policies were violated in his (and Sgt. Smith's) presence. *See*

5 Van Blaricom Amended  Report at §§ 7(j), 7(l), and 10(b).

6    OPD policies in effect at the time required all citizen complaints to be documented and

7 investigated.  Sgt. Smith filed no written report of the citizen complaints he received from Jan

8 about the "burglary in progress by the police", nor about Ralph's call later that evening.  Even

9 Jan's 911 call was not listed as a citizen complaint.

10    OPD (a political subdivision of the Defendant City of Olympia) has never documented or

11 investigated this incident, has never investigated either citizen complaints received from plaintiffs

12 on August 16, 2005.   None of the officers were investigated or disciplined for their role in this

13 incident.

14

## II.    LEGAL ARGUMENT

15

16    When the defendant Maynard accepted Ashley-Cole's request for help, and entered and

17 remained in plaintiffs home without a court order, without a warrant, he violated plaintiffs' clearly

18 established Fourth Amendment rights.  In the absence of any probable cause, Maynard's use of any

19 force was *per se* unreasonable, and violated Jan's clearly established Fourth Amendment rights.

20 Ashley-Cole acted "under color" of state law, as did the other individual defendants, when they

21 acted in concert to deprive plaintiffs of their rights.  The individual officers were negligently

22 trained and supervised.  The City of Olympia has a custom, policy and practice of making unlawful

23 entry into private homes, participating in the unlawful seizure of property and using excessive

24

25

LAW OFFICE OF
**HUGH J. McGAVICK, PS**
2937 INGALLS WAY
EUGENE, OR 97405
(541) 505-9145
FAX (541) 505-9143

1   force.  The City ratified the conduct of its officers by failing to investigate their conduct, by failing

2   to investigate citizen complaints, and by failing to discipline the officers or take corrective action.

3   None of the defendants is entitled to qualified immunity.

4                    ***FRUNZ v. CITY OF TACOMA* CONTROLS THIS CASE**

5          Controlling precedent regarding warrantless entry into a private residence is *Frunz v. City of*

6   *Tacoma* (9th Cir., November 13, 2006).  As in *Frunz*, the clearly stated, black letter law of the

7   United States and of the Ninth Circuit applies here:

8          "As the officers doubtless knew, physical entry into the home is the 'chief evil against which
           the wording of the Fourth Amendment is directed.'  *United States v. United States District*
9          *Court,* 407 US 297, 313 (1972); *see also Murdock v. Stout* 54 F.3d 1437, 1440 (9th Cir.
           1995) ('[P]rotection of individuals from unreasonable government intrusion into their homes
10         remains at the very core of the Fourth Amendment.'  To safeguard the home, we normally
           require a warrant before the police may enter.  'The right of privacy was deemed too
11         precious to entrust to the discretion of those whose job is the detection of crime and the
           arrest of criminals... . And so the Constitution requires a magistrate to pass on the desires of
12         the police before they violate the privacy of the home area.'  *McDonald v.  United States*,
           335 US 451, 455-56 (1948); *see also Groh v. Ramirez*, 540 US 551, 560 (2004)."
13

14  *Id*., at 2-3.  The Fourth Amendment was "too precious to entrust to the discretion" of Maynard,

15  Brown and Ashley-Cole to decide when and how they would enter plaintiffs' home.

16

17         *Beier v. City of Lewiston*, 354 F.3d 1058 (9th Cir. 2004), was controlling authority in the

18  *Frunz* case at summary judgment, at trial, in Ninth Circuit briefing, and is cited in the Ninth Circuit

19  opinion.  *Beier* was important in *Frunz* because its basic premise is that law enforcement officers

20  who respond to a hearsay report of an alleged need for police action rely upon those unsubstantiated

21  hearsay allegations at their peril.[1]  *Id.*, at 1071-72.  *Beier* was "clearly established law" when the

22  _____

23         [1]Although the *Frunz* officers backed away from it on appeal, the police there relied upon a

24  neighbor's 911 call which stated Susan Frunz *might* be in violation of a restraining order as a basis

25

Ps' TRIAL BRIEF - 10

LAW OFFICE OF
**HUGH J. McGAVICK, PS**
2937 INGALLS WAY
EUGENE, OR 97405
(541) 505-9145
FAX (541) 505-9143

1    case arose in 1998.  *Even if* Andrea Deitch was present on August 16, 2005, and *even if* she "gave

2    permission" to enter plaintiffs' home, she had no right to do so, as she had moved out 11 weeks

3    before.  *Even if* she lied to Maynard, and he believed her, he did so at his own peril.  Like the

4    defendants in Frunz, Maynard "could have knocked at the door, ...and politely asked the occupants

5    whether (Andrea) had a right to be there".  *See Frunz* slip opinion, at 12. The police nevertheless

6    acted upon hearsay reports, without verifying their validity.  They did so at their peril.

7          Unlike defendants, the officers in *Beier* (and *Frunz*) had no prior history with the parties, but

8    both Ashley-Cole and Maynard KNEW that Andrea had moved out of the Deitch-Imus home on

9    May 30, 2005, 11 weeks before this incident:  Defendant Maynard arranged for her transport, and

10   Ashley-Cole's took Andrea to another location on May 30, 2005, after which Ashley-Cole had

11   gathered household items for Andrea's new house, and visited at her new residence.

12

13                **THE MUNICIPAL DEFENDANTS ACTED "UNDER COLOR OF LAW"**

14          In order to establish liability under 42 USC § 1983, plaintiffs can prove they were deprived

15   of their federal constitutional right to be free from unreasonable search and seizure by the four

16   individual defendants, acting "under color of 'state law".  The actions of police officers in uniform,

17   armed, driving department issued vehicles, while on duty, clearly amount to actions taken under

18   color of state law.  Acts performed by individuals in their capacity as police officers, even if illegal

19   or not authorized by state law, are considered to have been taken under color of law.  *See Monroe v.*

20   *Pape*, 365 US 167, 180 (1961) (overruled on other grounds by *Monell v. Department of Social*

21

22   to enter her home.  Only after the police had broken open a door and entered, placed a gun between

23   her eyes, and cuffed Susan and her two guests face down on the kitchen floor did they check with

24   police records to find out if there was no warrant or a restraining order.

25

LAW OFFICE OF
**HUGH J. McGAVICK, PS**
2937 INGALLS WAY
EUGENE, OR 97405
(541) 505-9145
FAX (541) 505-9143

*Services of the City of New York*, 436 US 658 (1978)).  "Misuse of power, possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law, is action taken 'under color of state law'.  *See U.S. v. Classic,* 313 US 299, 326 (1941); *see also McDade v. West*, 223 F.3d 1135, 1139-41 (9th Cir. 2000) (state employee who accesses confidential information through a government-owned computer database acts "under color of state law"); *U.S. v. Walsh*, 194 F.3d 37, 51 (2d Cir. 1999) ("The relevant question ... is not whether the actual abuse was part of the defendant's official duties but, rather, whether the abuse was made possible only because the wrongdoer is clothed with the authority of state law.").  Defendant Maynard was "invited" to help Defendant Ashley-Cole only because he was a police officer.  No other "person" could have done what Maynard did, without risking arrest and criminal prosecution for residential burglary and theft, both while armed with a deadly weapon.

<strong>MS. ASHLEY-COLE ALSO ACTED "UNDER COLOR OF LAW"</strong>

Ms. Ashley-Cole could not have taken her part in this escapade without the facilitation of the police.  She (and Maynard) KNEW, had actual knowledge, that Andrea had vacated the Deitch and Imus residence on May 30, 2005, about 77 days before August 16.

Although §1983 provides no remedy against purely private actions, liability attaches when a private person acts in conjunction or conspiracy with a governmental official.  *See, e.g., Adickes v. S.H. Kress & Co.*, 398 US 144 (1970); *Berger v. Hanlon*, 129 F.3d 505, 515 (9th Cir.  1997), abrogated on other grounds by *Wilson v. Layne*, 526 US 603 (1999), judgment vacated on other grounds, *Hanlon v. Berger*, 119 S. Ct. 1716 (1999), cert denied, Cable News Network Inc. V. Berger, 119 S. Ct. 2039 (1999).  In *Lugar v. Edmondson Oil Co.*, 457 US 922, 937 (1982), the Supreme Court authorized a § 1983 action against a private party, and articulated the following

LAW OFFICE OF
**HUGH J. McGAVICK, PS**
2937 INGALLS WAY
EUGENE, OR 97405
(541) 505-9145
FAX (541) 505-9143

1  approach to determine when the conduct of a private defendant allegedly deprived a party of his

2  federal rights may fairly be attributable to the state:

3      First, the _deprivation must be caused by the exercise of some right_ or privilege created by
   the State _or by a rule of conduct imposed by the State or by a person for whom the State is_
4  _responsible_.... Second, the party charged with the deprivation must be a person who may
   fairly be said to be a _state actor_. This may be because he is a state official, _because he has_
5  _acted together with or has obtained significant aid from State officials_, or because his
   conduct is otherwise chargeable to the State.
6

7  _Id._ (emphasis added).

8      First, plaintiffs had a right to be free from unreasonable, warrantless searches and seizures.

9  Second, Ms. Ashley-Cole "acted together with" the other defendants to be able to gain entry into the

10 home, and to remove items.  She coordinated this raid in advance, and she confirmed defendant

11 Maynard was ready to help her by brazenly leaving a recorded message with Dispatch to arrange

12 their rendezvous.  _See_ (and hear) McGavick Dec.,  Ex. A and Ex. C _(_Ashley-Cole Dep., and CAD

13 report, Ex. #18 thereto).  "Generally in instances in which courts have found state action based on

14 concerted action between police officers and private parties, the police have substantially assisted in

15 the allegedly wrongful conduct."  _Gallagher v. "Neil Young Freedom Concert"_, 49 F.3d 1442, 1455

16 (10th Cir. 1995).  _See also Harvey v. Plains Tp. Police Department_, 421 F.3d 185, 191 (3d Cir.

17 2005), _cert denied_ 126 S.Ct. 2325 (2006) (state action found where officer ordered landlord to open

18 door).  Defendant Maynard went further than ordering the landlord to open the door: he entered

19 without authority, without even knocking, and once inside and confronted by the disturbed

20 homeowner, he used force to physically restrain Jan Imus.

21
22        **THE DEFENDANT OFFICERS WENT FAR BEYOND "KEEP THE PEACE"**

23     Maynard and Brown went much further than acting to "keep the peace".  _Cf._ McGavick Ex.

24
25

L AW O FFICE OF
**HUGH J. McGAVICK, PS**
2937 INGALLS WAY
EUGENE, OR 97405
(541) 505-9145
FAX (541) 505-9143

B [Maynard Deposition, Ex. #22, GO 74.1.4] and Ex. D (Chief Michel Dep, and Ex. 34 thereto).

"When a police officer is involved in a private party's repossession of property, there is no state action if the officer merely keeps the peace, but there is state action if the officer affirmatively intervenes to aid the repossessor enough that the repossession would not have occurred without the officers help...."  *Moore v. Carpenter*, 404 F.3d 1043, 1046 (8th Cir. 2005).  Entering without knocking, without inquiring, and restraining the homeowner within her home amounts to actionable "affirmative interventions".   Brown's warrantless "backup" entry was no more justified than was Maynard's entry: two wrongs do not make a right, two negatives do not equal a positive.  The raid did not happen without police involvement.  The police were there to facilitate Ms. Ashley-Cole's illegal intent, *even if* she acted with good faith, *even when* it turned into a warrantless entry into a private, clearly occupied residence, *even when* it required defendant Maynard to engage in the use of force to protect Ms. Ashley-Cole.

There is agreement amongst the Circuits that police officers are not state actors during private repossessions if they act only to keep the peace: when they go farther than merely keeping the peace, their action is done under color of state law.  *See Marcus v. McCollum*, 394 F.3d 813, 818 (10th Cir. 2004).  Defendants Maynard and Brown went further than keeping the peace: they assisted and protected the invader, like an offensive linemen protecting his quarterback, and physically restrained the home owner.  They are liable for their actions.

**FORMER TENANT ANDREA DEITCH HAD NO AUTHORITY TO CONSENT**

Even if Andrea gave "consent" to defendants Maynard and Ashley-Cole to enter the residence, and for defendant Brown to join them later, it was not legally sufficient to trump plaintiffs' Fourth Amendment rights.  But she had no such power.  Model Ninth Circuit Instruction

Law Office of
**HUGH J. McGAVICK, PS**
2937 INGALLS WAY
EUGENE, OR 97405
(541) 505-9145
FAX (541) 505-9143

9.2 (2007) provides that:

> In general, a search of a person's residence is unreasonable under the Fourth Amendment if the search is not authorized by a search warrant. A "search warrant" is a written order signed by a judge that permits a law enforcement officer to search a particular person, place, or thing. Under an exception to this rule, a search warrant is not required and a search is reasonable if a person in lawful possession of the area to be searched knowingly and voluntarily consents to the search *and there is not any express refusal to consent by another person who is physically present and also in lawful possession of the area to be searched*.

(Emphasis added.)

This "search warrant exception" is not deserved here, as the person who owned the house, Janet Imus, was in the house and directed defendants to vacate, but the police protected intruder Ashley-Cole and sided with a former tenant, one they had helped move out of plaintiffs house 10 weeks earlier: they had actual knowledge Andrea did not live there. The same instruction provides another exception, which is likewise not deserved: "In determining whether a consent to search is voluntary, consider all of the circumstances, including: whether the consenting person was told he or she had the right to refuse a request to search." Defendants claim Andrea "consented", as tho that was the end of the story. They are wrong. If defendants try to assert this police aided seizure of property was not a "search", they are fantasizing. It they claim the Fourth Amendment does not apply, they are mistaken again.

**THE INDIVIDUAL DEFENDANTS ARE NOT ENTITLED TO QUALIFIED IMMUNITY**

Resolving the issue of qualified immunity requires a sequential two-step approach. The threshold inquiry is whether the facts alleged—taken in the light most favorable to the party asserting the injury—show a constitutional violation. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). If a constitutional violation "could be made out on a favorable view of the parties' submissions, the next, sequential step is to ask whether the right was clearly established." *Id.* Put another way, the

LAW OFFICE OF
**HUGH J. McGAVICK, PS**
2937 INGALLS WAY
EUGENE, OR 97405
(541) 505-9145
FAX (541) 505-9143

second step asks whether it would have been sufficiently clear to a reasonable officer that the conduct was unlawful. *Id.* at 202. Here, the plaintiffs have alleged violation of their clearly established Fourth Amendment rights. Qualified immunity is not available to any defendant here.

**Plaintiffs' Fourth Amendment Rights Were Clearly Established on August 16, 2005**

Because the defendants violated Ms. Imus's right to be free from excessive force, and both plaintiffs' rights to be free from unauthorized entry into their home by police and neighbor, defendants can escape liability *only* if plaintiffs' rights were not "clearly established." *Saucier*, 533 U.S. at 201. To show that a right is clearly established, the plaintiffs need not produce a pre-existing case prohibiting the specific type of force in precisely the circumstances here. *See Hope v. Pelzer*, 536 U.S. 730, 678 (2002). Officers "can still be on notice that their conduct violates established law even in novel factual circumstances." *Id.* at 679. In some instances, "[a] general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though 'the very action in question has [not] previously been held unlawful.'" *Id.* (citations omitted). "Otherwise, officers would escape responsibility from the most egregious forms of conduct simply because there was no case on all fours prohibiting that particular manifestation of unconstitutional conduct." *Derole*, 272 F.3d at 1286. The question is whether the law on the date of the incident gave the defendants "fair warning" that their treatment of (plaintiff) was unconstitutional. *Hope*, 536 U.S. at 679. The facts relevant to answering this question must be construed in the light most favorable to the plaintiff. *Derole*, 272 F.3d at 1275 n.1; *Headwaters*, 276 F.3d at 1130. Even viewing the facts in the light most favorable to defendant, the law on August 16, 2005, including the 4th Amendment, gave the defendants more than fair warning that their conduct was unconstitutional.

LAW OFFICE OF
**HUGH J. McGAVICK, PS**
2937 INGALLS WAY
EUGENE, OR 97405
(541) 505-9145
FAX (541) 505-9143

1       Not surprisingly, there is no 2005 Supreme Court or Ninth Circuit case identical to our

2   unique and bizarre facts.  *Beier* was a Ninth Circuit opinion from 2004, based on facts which

3   happened in 1998: the court found the law of the 4th Amendment was clearly established in 1998,

4   seven years before this incident.  *Frunz* occurred in 2000: the Ninth Circuit had no trouble finding

5   the law clearly established five years before this incident.  Even without such directly applicable

6   precedent, where the "conduct is so patently violative of the constitutional right that reasonable

7   officials would know without guidance from the courts that the action was unconstitutional, closely

8   analogous pre-existing case law is not required to show that the law is clearly established."  *Derole*,

9   272 F.3d at 1286.  Like *Derole*, this is such a case.

10

11  **Defendants Brown and Smith are Liable**

12      Defendants Brown and Smith are liable because they ignored their affirmative duty to

13  intercede on behalf of a citizen whose constitutional rights were being violated in their presence:

14
            There is another route to police officer liability under the civil rights statutes
15          for injuries perpetrated by third persons. Pursuant to a long line of civil
            cases, police officers have a duty to intercede when their fellow officers
16          violate the constitutional rights of a suspect or other citizen.  *E.g., O'Neill v.*
            *Krzeminski*, 839 F.2d 9, 11 (2d Cir. 1988); *Byrd v. Clark*, 783 F.2d 1002,
17          1007 (11th Cir. 1986); *Bruner v. Dunaway,* 684 F.2d 422, 425-26 (6th Cir.
            1982); *Putman v. Gerloff*, 639 F.2d 415, 423 (8th Cir. 1981); *Byrd v.*
18          *Brishke*, 466 F.2d 6 (7th Cir. 1972).  In these cases, the constitutional right
            violated by the passive defendant is analytically the same as the right
19          violated by the person who strikes the blows.  *Thus an officer who failed to*
            *intercede when his colleagues were depriving a victim of his Fourth*
20          *Amendment right to be free from unreasonable force in the course of an*
            *arrest would, like his colleagues, be responsible for subjecting the victim to*
21          *a deprivation of his Fourth Amendment rights.*

22
23  *United States v. Koon*, 34 F.3d 1416, 1447 n.  (9th Cir. 1994) (emphasis added).

24
                                                    Law Office of
25                                              **HUGH J. McGAVICK, PS**
                                                    2937 INGALLS WAY
                                                    EUGENE, OR 97405
                                                    (541) 505-9145
    Ps' TRIAL BRIEF - 17                            FAX (541) 505-9143

1    Defendant Brown stood in the kitchen and watched while Maynard violated

2 plaintiffs' constitutional rights.  He heard Jan protest they had no right to be in her house,

3 and demand proof of a warrant or court order to be in her house, and be told there was no

4 warrant or court order authorizing entry.  He knew that she claimed that her personal

5 property was being stolen.  He admittedly stood there and watched while Defendant

6 Maynard physically restrained Ms. Imus from protecting her property.  Despite his concern,

7 his duty, and his ability to intervene, he did nothing.  *Id.*  Consequently, "like his

8 colleagues," he is responsible for his actions and inaction.

9

10    Likewise, Defendant Smith responded to a legitimate 911 call, which reported a

11 crime in progress.  He arrived to witness the crime being concluded by his subordinate

12 officers and Ashley-Cole.  He did nothing to stop the crime.  He did nothing to address

13 Jan's concerns: instead, he told her to call back when she "calmed down", and then he left

14 the scene.  He did nothing to protect her.  He did nothing to see that an incident report was

15 prepared.  He did nothing to cause his subordinates or himself to file a police report.  He

16 received a call from Ralph Deitch later that day, complaining about the same illegal action.

17 He did not document or investigate either complaint.  He did not train or re-train his

18 subordinates.  He did not discipline his subordinates.  He did nothing. Like Defendant

19 Brown, he is partially liable for plaintiffs' injuries.

20

21                    **THE CITY OF OLYMPIA IS  LIABLE**

22    It is well-settled that a municipality cannot be held liable for the acts of its officers

23 in an action brought under § 1983 based *solely* on the doctrine of *respondeat superior*.

24

25

LAW OFFICE OF
**HUGH J. McGAVICK, PS**
2937 INGALLS WAY
EUGENE, OR 97405
(541) 505-9145
FAX (541) 505-9143

1  *Monell v. Dept. of Social Serv.,* 436 U.S. 658, 691 (1978).  It also well-settled that a

2  municipality can be liable where "the execution of a government's policy or custom"

3  caused the constitutional injury.  *Id.* at 694.  A plaintiff can establish municipal liability in

4  several ways, one of which is by showing a policymaker's *ratification* of unconstitutional

5  conduct.  *See City of St Louis v. Praprotnik*, 485 U.S. 112, 127 (1988); *Pembaur v. City of*

6  *Cincinnati*, 485 U.S. 469, 483 (1986).  In the excessive force context, a municipality can be

7  liable if its chief law enforcement official ratifies the unconstitutional actions of police

8  officers by failing to discipline or investigate after the fact.  *Larez v. City of Los Angeles*,

9  946 F.2d 630, 647 (9th Cir. 1991) ("The jury properly could find such policy or custom from

10 the failure of [Chief] Gates to take any remedial steps after the violations.").  Municipal

11 liability can also be established by showing that a failure to adequately train "amounts to a

12 deliberate indifference to the rights of persons with whom the police come into contact."

13 *City of Canton v. Harris*, 489 U.S. 378, 388 (1989) (excessive force case).  For its failures

14 on each of these points, the City of Olympia is liable in this case.

15

16 The leading case on the use of post-event ratification is *Grandstaff v. City of*

17 *Borger*, 767 F.2d 161 (5th Cir. 1985), in which the Fifth Circuit affirmed a jury verdict

18 holding the city defendant liable.  The court noted that the plaintiffs had not pointed to a

19 single prior incident of police misconduct.  *Id.* at 171.  All they had proven was that six

20 officers on one shift displayed a reckless disregard for human life and safety.  *Id.*

21 Nevertheless, the court upheld the verdict, holding that the police chief's failure to

22 discharge, reprimand, or discipline any of the officers evidenced a preexisting policy of

23 deliberate indifference to the recklessness of its officers.  The Ninth Circuit has adopted the

24

25

LAW OFFICE OF
**HUGH J. McGAVICK, PS**
2937 INGALLS WAY
EUGENE, OR 97405
(541) 505-9145
FAX (541) 505-9143

1    Fifth Circuit's approach:

2           The disposition of the policymaker may be inferred from his conduct
3    *after* the events of that night.  Following this incompetent and catastrophic
     performance, *there were no reprimands, no discharges, and no admissions*
4    *of error*. . . .  If prior policy had been violated, we would expect to see a
     different reaction.  If what the officers did and failed to do on August 11,
5    1981, was not acceptable to the police chief, changes would have been
     made.
6
            *This reaction to so gross an abuse of the use of deadly weapons says*
7    *more about the existing disposition of the City's policymaker than would a*
     *dozen incidents where individual officers employed excessive force.*  The
8    policymaker's disposition, his policy on the use of deadly force, *after* [the
     date of the shooting] was evidence of his disposition *prior* to [that date]. . . .
9    [T]he subsequent acceptance of dangerous recklessness by the policymaker
     tends to prove his preexisting disposition and policy.
10
11   *Henry v. County of Shasta*, 132 F.3d 512, 520 (9th Cir. 1997) (quoting *Grandstaff*, 767 F.2d

12   at 171) (emphases added).  *See also McRorie v. Shimoda*, 795 F.2d 780, 785 (9th Cir. 1986).

13          This is a very unique case.  Three officers violated plaintiffs' Constitutional rights,

14   yet supposedly did not violate any OPD policy.  None of them received *any* discipline, not

15   even a verbal reprimand.  The officers' conduct was ratified by Chief Gary Michel, who

16   testified this was good police work.  OPD GO 74.1.3 and OPD GO 74.1.4 have not been

17   modified in any curative, significant fashion.  The City admits no error and maintains that

18   not a single defendant violated a single policy.  Even under their version of the facts, this

19   posture is untenable.  No discipline under *these* facts "says more about the existing

20   disposition of the City's policymaker than would a dozen incidents where individual

21   officers employed excessive force."  *Henry*, 132 F.2d at 520.

22
23          Likewise, the City's failure to conduct any investigation of plaintiffs' complaints,

24   much less a *good faith* investigation, speaks volumes.  Such tolerance in the form of failure

25

LAW OFFICE OF
**HUGH J. McGAVICK, PS**
2937 INGALLS WAY
EUGENE, OR 97405
(541) 505-9145
FAX (541) 505-9143

1   to meaningfully investigate and discipline constitutional violations shows a policy

2   supporting such violations.  *Hogan v. Franco*, 896 F. Supp. 1313, 1320 (N.D.N.Y. 1995).

3           Finally, the City's failure to adequately train its police force amounted to deliberate

4   indifference to the constitutional rights of its citizenry.  *See*, e.g., McGavick Dec., Ex. D

5   (Chief Michel Dep., and Ex. 34 thereto) (City answer to interrogatory 2-A-e: "[OPD

6   General Order 74.1] is not the type of Order that would have received specific 'training'.").

7    Despite the clearly established 4th Amendment prohibition against entering a residence

8   without a warrant, absent exigent circumstances, the City consciously chose *not* to train the

9   defendants on how to comply with the fourth Amendment during (what it likes to call)

10  "Keep the Peace" calls.  *Cf.* GO 74.1.3.  The City denied GO 74.1.3 applied to this conduct.

11  ("There were no specific policies, procedures or official guidelines (on August 16, 2005)

12  relating to keep the peace efforts that did not relate to civil process.  Civil process was

13  covered by the 11/1/03 version of General Order 74.1, and again, it has not application to

14  this case because there was no civil process".)  Neither the Chief nor the City could produce

15  any OPD GO which they felt applied to this situation.  The Chief and City admitted there

16  was no training on OPD GO 74.1.  Defendant Maynard was unfamiliar with GO 74.1 when

17  it was presented to him in his deposition last December: he had engaged in similar conduct

18  "lots of times".  Had the defendants been properly trained, this tragic event would not have

19  happened.

20          The City is liable for the action of officers it negligently trained and supervised.

21  OPD GO 74.1 and 74.3 were in place as of 11-03-03.  Had Defendants complied with them,

22  Maynard would not have accepted Ashley-Cole's "invitation", and Ashley-Cole would not

LAW OFFICE OF
**HUGH J. McGAVICK, PS**
2937 INGALLS WAY
EUGENE, OR 97405
(541) 505-9145
FAX (541) 505-9143

1   have done what she did.  Defendant Brown would not have been pulled into this mess,

2   Defendant Smith would not have failed to supervise his out-of-line officers, and there

3   would be no law suit.

4   **III.    CONCLUSION**

5          When Maynard assisted Ashley-Cole, he did so at his own peril, in violation fo

6   plaintiffs' clearly established Fourth Amendment rights.  Ashley-Cole acted "under color"

7   of state law, as did the other individual defendants, when they acted in concert to deprive

8   plaintiffs of their rights.  Maynard used excessive force against Jan. The individual officers

9   were negligently trained and supervised.  The City of Olympia has a custom, policy and

10  practice of making unlawful entry into private homes, participating in the unlawful seizure

11  of property and using excessive force.  The City ratified the conduct of its officers by

12  failing to investigate their conduct, by failing to investigate citizen complaints, and by

13  failing to discipline the officers or take corrective action.

14

15

16         DATED this 24th day of January, 2008

17                                    LAW OFFICES OF
                                      HUGH J. McGAVICK, PS

18
                                           /s/
19                                    By: _____
                                          Hugh J. McGavick, WSBA #12047
20                                        Attorney for Plaintiffs

21

22

23

24                                                        LAW OFFICE OF
                                                    **HUGH J. McGAVICK, PS**
25                                                      2937 INGALLS WAY
                                                        EUGENE, OR 97405
                                                          (541) 505-9145
    Ps' TRIAL BRIEF - 22                                FAX (541) 505-9143